## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| DIANE RIVERA, | ) | CASE NO. 5:16CV00105 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Diane Rivera ("Plaintiff"), challenges the final decision of Defendant, Carolyn

W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her applications

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

preparation of a Report and Recommendation.  For the reasons set forth below, the Magistrate

Judge recommends that the Commissioner's final decision be VACATED and this matter be

REMANDED for further proceedings consistent with this Report and Recommendation.

## I.  PROCEDURAL HISTORY

Before being denied benefits in the present case, Plaintiff had previously applied for DIB and SSI with an onset date of May 24, 2010.  She had a hearing before an ALJ, and her applications were denied on October 26, 2011.  (Tr. 77-86).  Shortly thereafter, in November 2011, Plaintiff was assaulted by her boyfriend.  (Tr. 398).  As a result, she suffered from brain injury, PTSD, depression, and anxiety, among other things.  *See infra*, Sec. II.B.

In May 2012, Plaintiff filed applications for DIB and SSI, which are the subject of the instant case, based on the impairments arising from the November 2011 assault.  (Tr. 252).  She alleged a disability onset date of October 27, 2011, claiming she was disabled due to brain injury (head pain), back pain, PTSD, major depression and anxiety, short-term memory loss, and pelvic cancer.  (Transcript ("Tr.") 110).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 167-171, 180-97, Tr. 155).

In June 2014, the ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 29-46).  On September 3, 2014, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 10-22).  The ALJ's decision became final on November 25, 2015, when the Appeals Council declined further review.  (Tr. 1-3).

On January 18, 2016, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16).  Plaintiff  asserts the following assignments of error:

(1)  The ALJ failed to state valid reasons for rejecting the opinions of the treating physicians David Joseph and John Harris

2

(2)  The ALJ did not properly evaluate Rivera's post-traumatic stress disorder at step thee of the sequential evaluation

(3) the ALJ did not properly evaluate Rivera's credibility.

(4) the ALJ did not meet his burden at step five of the sequential evaluation.

(Doc. No. 13, p. 1).

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on May 6, 1963 and was fifty-one years-old at the time of her administrative hearing.  (Tr. 33).  She has a GED and is able to communicate in English.  (*Id.*) She has past relevant work as a medical assistant (Tr.33), production assistant (Tr. 34), and records clerk.  (Tr. 34).

### B.    Medical and Mental Health Evidence

On November 20, 2011, after having been assaulted by her boyfriend, Plaintiff visited the emergency department at New Hanover Regional Medical Center.  (Tr. 398, 431-432).  A CT scan of Plaintiff's brain showed "stable appearance to high attenuation along with left frontal cortical surface.  Most compatible with a cortical contusion with minimal adjacent subarachnoid hemorrhage, stable in appearance, small stable right-sided tentoral subdural hematoma."[1]  (Tr. 390).  CT scans of the thoracic and lumbar spines were positive for "scattered blastic lesions in several thoracic and lumbar vertebral bodies."  (Tr. 393).

---

[1]    A later MRI, taken January 16, 2012, showed that the subdural hematoma had resolved.  (Tr. 438).

An MRI of the lumbar spine taken December 16, 2011, showed "a prior L1 laminectomy along with an L4/5 central annual tear without protrusion." (Tr. 458). An MRI of the thoracic spine was positive for "shallow left T6/7 paramedial disk osteophyte complex encroaching upon the anterior aspect of the thecal sac and cord." (Tr. 459).

On January 12, 2012, Plaintiff was seen by Adam Brown, M.D., for a physical exam after the assault. (Tr. 433). She complained of bilateral lower extremity numbness and tingling (Tr. 434). Dr. Brown noted, "status post assault with symptoms of postconcussive syndrome mainly with headaches, memory difficulty and dizziness," and "conus tumor removal back in 2003 with bilateral foot numbness." (Tr. 433). Plaintiff was referred to Christie Jones, Ph.D. for treatment for post-concussive syndrome and post-traumatic stress disorder. (Tr. 433).

On February 8, 2012, Plaintiff was seen by her primary care provider, Nurse Practitioner Marie Wheatley. (Tr. 473). Plaintiff reported panic, insomnia, and flashbacks about having been assaulted. (Tr. 479). Ms. Wheatley diagnosed post-traumatic stress disorder. (Tr. 480).

On February 14, 2012, plaintiff was seen by licensed counselor Kathleen Gomes. (Tr. 524). Plaintiff reported feeling fearful of her ex-boyfriend, and experiencing anxiety, high stress, and nightmares. (Tr. 532). Plaintiff reported that she had a concussion and was experiencing slurred speech and short term memory loss. (Tr. 524). Plaintiff reported that she was afraid all of the time and feels like she is "always shaking inside." (Tr. 525). Plaintiff also reported that "when she is depressed she can't read because she cannot retain things, she cannot concentrate." Lastly, she stated that she did not want to get out of bed, get dressed, or leave her home. (Tr. 532). Ms. Gomes noted logical thought process, depressed mood, flat affect, cooperative behavior, memory impairment, little to no insight, and adequate social judgment. (Tr. 529). Ms.

4

Gomes diagnosed PTSD and major depressive disorder (recurrent, moderate), and she assigned plaintiff a GAF[2] score of 45.  (Tr. 532).

Later that month, on February 24, 2012, Plaintiff was seen again by her nurse practitioner, Marie Wheatley.  (Tr. 473).  Plaintiff reported that her symptoms were improving on medication.  (Tr. 473).  In particular, Plaintiff noticed improved mood, energy, sleep, appetite, and concentration.  (Tr. 473).  Ms. Wheatley diagnosed post concussion syndrome.  (Tr. 474).

On May 24, 2012, Plaintiff was seen by psychiatrist David Joseph, M.D., for an initial examination.  (Tr. 537-538).  Plaintiff's chief complaint was "I suffered a bad trauma.  I was beaten pretty severely and had brain injury.  I have trouble remembering things."  (Tr. 537). Plaintiff reported a history of two previous hospitalizations for suicide attempts, with the last attempt having occurred in 2010.  (Tr. 537).  Plaintiff denied suicidal or homicidal ideation, hallucinations, and delusion.  She reported ongoing headaches, decreased energy or motivation, fatigue, excessive worrying, irritability, sadness, feelings of worthlessness, difficulty concentrating, having panic attacks, and anxiety.  (Tr. 537).

---

[2]      The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

5

During the same May 2012 visit, Dr. Joseph observed that Plaintiff was "glum" and looks unhappy, but she was fully communicative.  (Tr. 538).  She exhibited  "no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process."  (Tr. 538).  Dr. Joseph noted logical thinking, appropriate thought content, and intact social judgment.  She showed signs of anxiety and was easily distracted.  (Tr. 538).  Dr. Joseph rated her depression at moderate to severe.  (Tr. 538).  Dr. Joseph diagnosed PTSD, traumatic brain injury, and major depressive disorder.  (Tr. 538).  Plaintiff continued on antidepressant and anti-anxiety medications.  Dr. Joseph assigned Plaintiff GAF score of 55 and recommended another evaluation in a few weeks.  (Tr. 538).

On June 5, 2012, Plaintiff visited the emergency department complaining of a throbbing, "global headache" which started in January 2012.  (Tr. 499).  A brain MRI was found to be normal.  (Tr. 502).

On June 21, 2012, Plaintiff followed up with Dr. Joseph.  Her mental status was largely unchanged from the previous visit, but Dr. Joseph rated her depression at "mild to moderate." (Tr. 558.)  He again noted a GAF score of 55.[3]

On July 3, 2012, Plaintiff presented to her primary care provider Marie Wheatley.  (Tr. 549).  Plaintiff was positive for appetite change, fatigue, weight change, nausea, abdominal pain, myalgias, arthralgias, and headaches.  (Tr. 549).

---

[3]     The ALJ incorrectly stated that Dr. Joseph assigned Plaintiff a GAF score of 65 at this visit.  Duplicate, legible treatment notes show that the GAF score was 55. (Tr. 558).

6

On July 19, 2012, Plaintiff returned to Dr. Joseph and reported that she was "still crying some." (Tr. 557). Dr. Joseph noted signs of moderate depression and anxiety but no signs of hyperactivity or attentional difficulties. He again assigned a 55 GAF score. (Tr. 557).

On August 16, 2012, Plaintiff was seen by Dr. Joseph. She complained of "some progressive downhill feelings of depression," and having "no energy." (Tr. 556). Dr. Joseph noted

> Mental status has no gross abnormalities. Mood is euthymic with no signs of depression or manic process. Her speech is normal in rate, volume and articulation and her language skills are intact. Suicidal or self injurious ideas or impulses are convincingly denied. She denies hallucinations and delusions and there no thought disorder. Associations are intact, thinking is generally logical and though content is appropriate. Her cognitive functioning, based on vocabulary and fund of knowledge, is intact and age appropriate, and she is fully oriented. There are no signs of anxiety. There are no signs of attentional or hyperactive difficulties. Insight and judgement are intact.

(Tr. 556).

On October 15, 2012, Plaintiff presented to her nurse practitioner, who noted post-concussion syndrome, migraines, poor vision, and back pain. (Tr. 545). Ms. Wheatley observed that "[t]he patient has a normal mood and affect. Behavior is normal." (Tr. 546).

On November 1, 2012, Plaintiff presented to her psychiatrist Dr. Joseph. His notes indicated that Plaintiff was "Ok on meds so far." They discussed refills, and Dr. Joseph noted that her "short term memory is horrible." (Tr. 554).

On March 11, 2013, Ms. Wheatley diagnosed Plaintiff with PTSD, post-concussion syndrome, fibromyalgia, headaches due to old trauma, and memory impairment. (Tr. 561).

On March 21, 2013, Plaintiff was seen by neurologist Alfred DeMaria, M.D., and she complained of headaches and numbness in her legs. (Tr. 588-89). Dr. DeMaria noted that she

7

was cooperative, had an appropriate mood, had a normal affect, had normal speech, and exhibited normal concentration and intact memory.  (Tr. 589).

On December 7, 2013, Plaintiff presented to Akron General Health System with chest pain.  (Tr. 618-621).  She was admitted to rule out acute coronary syndrome.  (Tr. 620).  Her medical history of subdural hematoma, post-concussive syndrome, depression, and PTSD was noted.  (Tr. 618).  Treatment notes indicate atypical chest pain, migraine, seizure disorder, PTSD, and deep vein thrombosis.  (Tr. 631).

On February 13, 2014, Plaintiff was hospitalized at Brunswick Medical Center.  (Tr. 645).  Her discharge summary includes diagnoses of altered mental status with worsening neurologic symptoms, a history of traumatic brain injury, history of PTSD, fibromyalgia, depression, and anxiety.  (Tr. 645).

On February 18, 2014, Plaintiff presented to Dr. DeMaria, complaining of headaches. (Tr. 668)  Dr. DeMaria noted that she had back and neck pain, headaches, insomnia, and paresthesia.  (Tr. 668, 672, 675).  Her mental status at that time was unchanged from the previous visit in March 2013.  (Tr. 669).

## C.      Opinion Evidence

### 1.        State Agency Review-Nancy Lloyd, Ph.D.

State agency psychologist Nancy Lloyd, Ph.D., reviewed Plaintiff's medical records on August 28, 2012.  (Tr. 110-126).  Dr. Lloyd noted the presence of an organic mental disorder, affective disorder, anxiety-related disorder, and a substance addiction disorder.  (Tr. 117). However, she found that none of Plaintiff's impairments precisely satisfy the diagnostic criteria. (Tr. 117).  Dr. Lloyd determined that Plaintiff had mild limitations in activities of daily living,

8

and moderate limitations in social functioning and maintaining concentration, persistence, or pace.  (Tr. 117).

Dr. Lloyd opined that Plaintiff could: understand and remember at least simple directions for periods of two to four hours with appropriate breaks; carry out simple instructions and maintain concentration long enough to complete tasks; handle simple, routine, and repetitive tasks; adapt to interpersonal demands; adjust to a work environment as needed and as delegated by supervision; and perform in an environment with minimal public involvement that is not based on production demands.  (Tr. 122-24).

### 2. State Agency Review - Jeff Long, Ph.D.

In January 2013, state agency psychologist Jeff Long, Ph.D., reviewed Plaintiff's medical records and assessed her mental limitations.  (Tr. 148-166).  Dr. Long noted the same restrictions as Dr. Lloyd, but excluded the limitation that Plaintiff is capable of performing in an environment with minimal public involvement that is not based on production demands.  (Tr. 163).

### 3. Plaintiff's Counselor Kathleen Gomes

On May 6, 2013, licensed counselor Kathleen Gomes completed a psychiatric review technique form. (Tr. 681-91).  Ms. Gomes opined that Plaintiff had anxiety related disorders, PTSD, and moderate depression.  (Tr. 681-82).  In particular, she noted emotional withdrawal and/or isolation, anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, persistent irrational fear, recurrent severe panic attacks, and recurrent and intrusive recollections of a traumatic experience.  (Tr. 681-86).  Ms. Gomes concluded that Plaintiff had a marked limitation in activities of daily

9

living, marked limitation in maintaining social functioning, and a marked limitation in maintaining concentration, persistence, or pace.  (Tr. 691).

### 4.     Plaintiff's Treating Physician John Harris, M.D.

On April 28, 2014, John Harris, M.D., Plaintiff's treating physician, completed a medical statement regarding Plaintiff's depression.  (Tr. 677-680).  Dr. Harris diagnosed PTSD and major depressive disorder, recurrent, moderate. (Tr. 677).  He indicated that Plaintiff exhibited six out of nine depressive symptoms, including anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide.  (Tr. 677). He concluded that she was moderately limited in her activities of daily living; and moderately limited in maintaining social functioning.  He also found unspecified deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

He further concluded that she was markedly impaired in 18 of 20 work-related areas of mental functioning, including

- the ability to understand and remember short and simple instructions

- the ability to understand and remember detailed instructions

- the ability to carry out very short and simple instructions

- the ability to carry out detailed instructions

- the ability to maintain attention and concentration for extended periods

- the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- the ability to sustain an ordinary routine without special supervision

- the ability to work in coordination with and proximity with others without being distracted by them

- the ability to make simple work-related decisions

- the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- the ability to act appropriately with the general public

- the ability to accept instructions and respond appropriately to criticism from supervisors

- the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- the ability to maintain socially appropriate behavior and to adhere to basic standards of cleanliness

- the ability to respond appropriately to changes in the work setting

- the ability to be aware of normal hazards and take appropriate precautions

- the ability to travel in unfamiliar places or use public transportation

- the ability to set realistic goals or make plans independently of others

(Tr. 678-79).  Dr. Harris found that she was moderately impaired as to her ability to remember locations and work-like procedures and as to the ability to ask simple questions or request assistance.  (Tr. 678-79).  Dr. Harris commented that "Ms. Rivera has difficulty with short term memory loss and gets easily distracted.  She needs to have instructions repeated to ensure she can perform tasks.  Even then, she has difficulty remembering what she is told."  (Tr. 679).  Dr. Harris assigned Plaintiff a GAF score of 48.  (Tr. 677).

11

### D.      Hearing Testimony

Plaintiff testified that she last worked in April 2010. (Tr. 33).  She stopped working when she started tripping at work, losing control of her legs, and having problems with her back.  (Tr. 35).  Plaintiff testified that seven years earlier she had back surgery.  (Tr. 36).  Plaintiff also testified that she had depression and post-traumatic stress disorder, which affected her ability to concentrate, caused nightmares, and interfered with her ability to sleep.  (Tr. 36).

Plaintiff testified about her anxiety, stating that at the time of the hearing she was having more than five (5) anxiety attacks a day.  (Tr. 36).  She also had trouble sleeping, getting only four (4) hours of sleep per night.  (Tr. 38).  Twelve to fourteen days per month, her depression and PTSD prevented her from getting out of bed.  (Tr. 37).  Plaintiff testified that she tried to do something in the house every day, such as emptying the dishwasher.  (Tr. 38).  She would watch television, but she claimed she had difficulty staying focused even for a thirty-minute television show.  (Tr. 39).  She testified that her mother or a friend had to remind her about appointments and that she had to write everything down.  (Tr. 39).

As a result of her back pain, Plaintiff could only stand ten to fifteen minutes (Tr. 39) and sit ten to twenty minutes.  (Tr. 40).  She could only walk across the street and back before needing to rest.  (Tr. 40).  Plaintiff also testified that walking up any stairs made her dizzy.  (Tr. 40).  She indicated that she did not have good balance due to her migraines.  (Tr. 40).  Plaintiff had difficulty lifting because of an injury to her left shoulder.  (Tr. 41).  Plaintiff indicated that she had migraine headaches every day.  (Tr. 41).  She would take medication, which would cause her vision to be a little blurry. (Tr. 41-42).

12

She testified that she alternated between living with her mother and a friend.  (Tr. 42). She was able to run the dishwasher, cook a little bit, make the bed, and she did laundry.  (Tr. 42). Plaintiff was unable to do any heavy duty vacuuming or "anything like that."  (Tr. 42).

A vocational expert testified at the hearing.  According the VE, Plaintiff had worked in the last fifteen years as a production technician, records clerk, and medical assistant.  (Tr. 43). The ALJ posed the following hypothetical to the VE:

> Assume a hypothetical individual of the Claimant's age, education and vocational background who can perform light work except that this individual cannot climb ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch and crawl. She must avoid working at unprotected heights. And she must avoid working around hazardous machinery. In addition, she is limited to simple, routine, repetitive tasks in an environment where changes are infrequent and are introduced gradually and where there is only casual interaction with the general public.

Tr. (43-44).  In response to this question, the VE opined that such an individual could perform the jobs of a linen grader, paper inserter, or garment bagger (Tr. 44).

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

13

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).

Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).

Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on her alleged disability onset date, October 27, 2011 and remained insured through June 30, 2014. (Tr. 10, 12). Therefore, in order to be entitled to DIB, Plaintiff must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2.    The claimant has not engaged in substantial gainful activity since October 27, 2011.

3.    The claimant has the following severe impairments: degenerative disc disease, L5-S1 annular tear, headaches with status post cerebral trauma, depresssion, anxiety, and post-traumatic stress disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416. 925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he [sic] cannot climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, or crawl; should avoid work at unprotected heights or around hazardous machinery; and is limited to simple, routine, repetitive tasks in and [sic] environment where changes are infrequent and are introduced gradually and where there is only casual interaction with the general public.

6.    The claimant is unable to perform past relevant work.

7.    The claimant was born on May 6, 1963 and was 47 years old, which is defined as a younger person age 18-49, on the alleged disability date. The

15

claimant subsequently changed age category to closely approaching advanced age.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform

11.      The claimant has not been under a disability, as defined in the Social Security Act, from October 27, 2011, through the date of this decision.

(Tr. 12-22).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

16

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*,
889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston
v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner
are not subject to reversal, however, merely because there exists in the record substantial
evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.
2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of
Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another
conclusion, the decision of the Administrative Law Judge must stand if the evidence could
reasonably support the conclusion reached.")  This is so because there is a "zone of choice"
within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d
at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by
substantial evidence, the Court must determine whether proper legal standards were applied.
Failure of the Commissioner to apply the correct legal standards as promulgated by the
regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281
(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if
supported by substantial evidence, however, a decision of the Commissioner will not be upheld
where the SSA fails to follow its own regulations and where that error prejudices a claimant on
the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough
evidence in the record to support the decision, [where] the reasons given by the trier of fact do

17

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Upon review of the record, this Court concludes that substantial evidence does not support the ALJ's decision, as there is no logical bridge between the evidence and the Commissioner's decision to deny benefits.  This social security benefits appeal relates to impairments that resulted from, or were exacerbated by, a physical assault on Plaintiff that occurred in November 2011.  The primary error in this matter arises from the ALJ's reliance on the opinions of two non-examining state agency consultants, Dr. Lloyd and Dr. Long, whose opinions were based on evidence and facts predating the assault on Plaintiff and relating to Plaintiff's previous application for benefits.  In particular, Drs. Lloyd and Long gave "great weight" to the opinion of Dr. Carraway, a psychologist who examined Plaintiff prior to the assault and opined that Plaintiff's mental conditions were not disabling.  Drs. Lloyd and Long also gave great weight to the pre-assault findings of the first ALJ in relation to Plaintiff's first benefits application.

As described in more detail below, the issue is not that the ALJ relied on the opinions of Drs. Long and Lloyd *per se*.  Rather, it is that the ALJ gave their opinions greater weight than

18

the opinion of Plaintiff's treating physician without properly explaining his reasons for doing so. In particular, the ALJ failed to acknowledge that Dr. Long's and Dr. Lloyd's opinions afforded "great weight" to the extra-record pre-assault evidence noted above, and he failed to explain how, despite such reliance, Long's and Lloyd's opinions deserved more weight than the opinion of Dr. Harris, Plaintiff's treating physician.  Such analysis is necessary here to comport with the treating physician rule.

The discussion will begin with a detailed description of the case as it relates to the extra-record evidence and the opinions of the non-examining state agency physicians.  Questions relating to the treating physician rule, Plaintiff's credibility, an alleged step three error, and an alleged step four error will be addressed thereafter.

**A.       Case History Relating to Extra-Record Pre-Assault Evidence**

As noted in the fact section, *supra* Sec. I, Plaintiff previously sought benefits in April 2010 ("the first application").  In connection with that application, Plaintiff was seen by Anthony G. Carraway, M.D, a consultative examiner.  (Doc. No. 15-1).  On June 18, 2010, Dr. Carraway conducted a mental status exam and made the following assessment:

> She had no impairment of short term memory, no impairment of immediate memory. Attention and concentration were not impaired. Her ability to understand, retain and perform instructions is not impaired. Her ability to perform simple repetitive tasks and to persist at those tasks primarily would be limited by her objective physical findings and somatic complaints. Her stress tolerance appears to be moderately impaired. She appears to have mild to moderate social and interpersonal difficulty present. Her symptoms appear forthrightly reported.

(Doc. No. 15-1 at 6).

On August 17, 2011, a hearing on Plaintiff's first application before ALJ Marcus Christ ("the first ALJ").  (Tr. 77).  On October 26, 2011, the application was denied.  (Tr. 74-90).  In

19

his written decision ("the first decision"), the first ALJ relied on Dr. Carraway's examination notes, *inter alia*, to support the conclusion that Plaintiff's mental problems were non-disabling. (Tr. 82-83).

In November 2011, soon after the first decision was entered, Plaintiff was assaulted by her boyfriend.  The resulting injury had both physical and psychological components: Plaintiff suffered from a brain injury, PTSD, depression, and anxiety.  On May 14, 2012, in light of her changed physical and mental conditions, Plaintiff filed a second application for benefits (the denial of which is the subject of this case).

On August 28, 2012, a state agency psychologist, Nancy Lloyd, Ph.D., completed a mental RFC in connection with Plaintiff's second application.  *See supra* Sec II.C.1.  Dr. Lloyd concluded that Plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning, and moderate limitations maintaining concentration, persistence, or pace.  In reaching this conclusion, Dr. Lloyd gave "great weight" to Dr. Carraway's pre-assault opinion "due to consistency with the overall evidence."  (Tr. 118).  Further in support of her conclusion, she gave "great weight" to the pre-assault opinion of the first ALJ, "secondary to consistency with the MER and objective evidence."  (Tr. 118).

On January 15, 2013, another state agency psychologist, Jeff Long, Ph.D., found that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *See supra* Sec. II.C.2.  Dr. Long concluded that the findings of the first ALJ were similar to his own findings, and he noted that the first ALJ's "findings have been incorporated into decision in

addition to evidence obtained after ALJ."  (Tr. 157).  He also concluded that the opinion of Dr. Carraway deserved "great weight" "due to consistency with the overall evidence." (Tr. 157).

On April 28, 2014, as described *supra* Sec. II.C.4, John Harris, M.D., Plaintiff's treating physician, completed a medical statement regarding Plaintiff's depression, and he opined that Plaintiff was moderately limited in some areas of functioning and markedly limited in a number of others.  (Tr. 677-680).  He assigned a GAF score of 48.  (Tr. 680).

In June 2014, a hearing on the second application for benefits was held before ALJ Carl B. Watson.  (Tr. 10).  On September 3, 2014, ALJ Watson issued a decision denying Plaintiff's second application.  (Tr. 10-22).  ALJ Watson found the opinion of Plaintiff's treating physician internally inconsistent and inconsistent with the claimant's treatment records, and he favored the opinions of Dr. Lloyd and Dr. Long over the opinions of Plaintiff's treating sources.  (Tr. 19). Consistent with the opinions of Dr. Lloyd and Dr. Long, ALJ Watson formulated an RFC that included a limitation to simple, routine, repetitive tasks in an environment where changes are infrequent and are introduced gradually and where there is only casual interaction with the general public.  (*Compare* Tr. 15 with Tr. 122-23 and Tr. 162-63).

**B.      The Treating Physician Rule**

**1.      Dr. Harris**

The ALJ erred by failing to properly explain his reasons for giving more weight to the opinions of Drs. Lloyd and Long than he did to the opinion of Dr. Harris, Plaintiff's treating physician.  First, ALJ Watson failed to recognize that both Dr. Lloyd and Dr. Long explicitly gave "great weight" to arguably irrelevant evidence and opinion; and second he failed to

21

adequately explain why Dr. Lloyd and Dr. Long's opinions nonetheless deserve more weight than that of Dr. Harris.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources."  Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996).  This may occur, for example, when the "State agency medical ... consultant's opinion is based on a review of a complete case record that ... provides more detailed and comprehensive information than what was available to the individual's treating source."  *Id.*

In this case, the ALJ concluded that Dr. Harris's medical opinion deserved less than controlling weight, and he discussed the weight of Dr. Harris's opinion as follows:

> The medical source statement of John Harris, M.D., the medical director of Coastal Horizons, in internally inconsistent and inconsistent with the claimant's treatment records.  Dr. Harris indicated the claimant only had moderate difficulties maintaining social functioning and with restrictions of activities of daily living, but then indicated

22

mostly marked limitations when asked about specific abilities to follow directions, make decisions, perform activities, and interact with others.

The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services [Drs. Lloyd and Long] also found that the claimant was not disabled albeit using a different rationale.  Although these physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, these opinions do deserve some weight as they supported by the objective medical evidence of record.

(Tr. 19).

The ALJ's analysis as to Dr. Harris is incomplete.  The ALJ failed to adequately explain why the opinions of the state agency psychologists were favored over Dr. Harris.  The state agency psychologists received "some weight" while Dr. Harris's opinion was apparently afforded little to no weight.  It is not evident that the opinions of Drs. Lloyd and Long should be preferred as they were based on "more detailed and comprehensive information than what was available to the individual's treating source."  Rather, both state agency opinions were based, at least in part, on evidence outside the record -- i.e. Dr. Carraway's pre-assault opinion, which was afforded "great weight."  And both opinions relied on a pre-assault decision denying Plaintiff's previous application for benefits, which was also afforded "great weight."  The ALJ here favored these state agency opinions, without clearly and reasonably explaining how the opinions are reliable despite their explicit reliance on arguably stale and irrelevant evidence.

Highlighting the necessity of providing such an explanation is the recognition by the ALJ himself that there is an inherent problem with relying on pre-assault evidence in order to decide a post-assault disability claim.  In his written decision, the ALJ noted that he considered the findings of the prior ALJ, but he decided that the findings should be given little weight, because Plaintiff's "primary impairments, her PTSD and headaches, *are the result of an assault*

23

*that occurred after the prior decision was rendered.*"  (Tr. 20) (emphasis added).  Thus, the ALJ

thought it improper to give any significant weight to the pre-assault findings of the prior ALJ,

but he decided to favor the opinions of Lloyd and Long, who did just that.  Under the treating

physician rule, the ALJ must provide reasons that are sufficiently specific to allow "meaningful

appellate review of the ALJ's application of the rule."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

234, 243 (6th Cir. 2007).  Here, the ALJ's reasons for discounting Dr. Harris and favoring the

state agency psychologists are not clear, in light of the problems that the Court has identified

with respect to Drs. Lloyd and Long.

      While the Commissioner points to problems with Dr. Harris's -- a purported internal

inconsistency and purported inconsistency with the record as a whole-- these justifications are

inadequate in this instance, in light of the problems just described.  To qualify as a good reason,

a reason must be "supported by the evidence in the case record, and must be sufficiently specific

to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96–2p, 1996 WL

374188, at *5.  Here, the ALJ noted inconsistencies with the record generally, without stating

any specifics.  As for the alleged internal inconsistencies, the ALJ's reasoning is also

insufficient.  It is not self-evidently inconsistent for an individual who is moderately limited as to

her activities of daily living (eating, bathing, dressing, etc.) to have marked limitations as to

work skills such as and for example, the ability to perform activities within a schedule, or the

ability to understand and remember detailed instructions.

      In sum, the ALJ failed to provide "good reasons" for affording Dr. Harris's opinion less

than controlling weight.

### 2.    Dr. Joseph

Plaintiff also contends that the ALJ improperly weighted the opinion of another treating physician, Dr. Joseph.  The Commissioner points out, however, that while Dr. Joseph's treatment notes are part of the record, Dr. Joseph did not produce an actual medical opinion that reflects what Plaintiff could do despite her limitations.  Thus, without a treating source opinion from Dr. Joseph in the record, the treating physician rule does not apply to him.  On the other hand, it is evident that the ALJ erred when reviewing Dr. Joseph's treatment notes.  The Commissioner concedes that the ALJ misidentified Dr. Joseph's assigned GAF score as 65 when it was in fact 55.  Thus, on remand, the ALJ must consider the correct GAF score in the context of the whole record.

### 3.    Ms. Gomes

Plaintiff disagrees with the ALJ's decision to give Ms. Gomes's opinion little weight.  Ms. Gomes is a licensed counselor and not an acceptable medical source under the regulations.  SSR 06-03p, 2006WL 2329939, at *1 (Aug. 9, 2006).  SSR 06-03p provides that a non-acceptable medical source, such as Ms. Gomes, cannot establish the existence of an impairment, but may provide insight into the severity of an impairment.  Generally, an ALJ should explain the weight given to the opinions from other sources.  SSR 06-03p.  In this case, the ALJ gave Ms. Gomes's opinion little weight, reasoning as follows:

> Ms. Gomes' opinion is given little weight.  Because she is not an acceptable medical source, her opinion is considered under SSR 06-03p.  Her opinion was supplied using check-off forms apparently supplied by the claimant's representative.  The use of such forms, when considered in conjunction with the non-treating relationship between Ms. Gomes and the claimant, can be seen as encouraging a "disabled" conclusion.  In so finding, the undersigned notes that the use of such forms which require checking off of various blocks amounts only to a summary conclusion about function and is not a residual functional capacity.  The undersigned also noted that such medical forms are

25

designed for use by highly-trained Disability Determination Services personnel, who are guided by numerous regulations and memoranda. The use of such forms by non-Social Security Administration personnel (even if they are licensed physicians) invariably involves disparity in conclusions regarding the definition of medical and non-medical terms. Social Security Ruling 00-4p, while a relatively recent poly interpretation regarding the use of vocational expert evidence, (See 20 CFR 404.1560 and 416.960, effective September 25, 2003), provides clear direction that an Administrative Law Judge cannot rely on evidence if such evidence is based on indulging assumptions or definitions that are inconsistent with Social Security Administration's regulatory policies or definitions. Following a thorough review of the record, the undersigned finds that Ms. Gomes' medical opinions are unsupported by the weight of the evidence of record.

(Tr. 19). While Plaintiff disagrees with the weight afforded to Ms. Gomes, she does not explain how the ALJ's reasons for discounting Ms. Gomes's opinion were inadequate. The Court is unable to find a legal error on the face of the ALJ's opinion with respect to Ms. Gomes. Nonetheless, because this Court is recommending that this matter be reversed and remanded, the ALJ may be required to reconsider Ms. Gomes's opinion in the process of correcting the other legal errors noted by this report and recommendation.

**C.      Plaintiff's Credibility**

During the hearing, Plaintiff testified that twelve to fourteen days a month, her PTSD, anxiety, and depression prevent her from getting out of bed. (Tr. 37). In his written decision, the ALJ questioned Plaintiff's credibility with respect to this testimony. Plaintiff maintains that the ALJ improperly evaluated her credibility.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, "[t]he determination or decision must contain specific reasons for the finding on

credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96–7p, Purpose section, 1996 WL 374186 (July 2, 1996); *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").  To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose, 1996 WL 374186 (July 2, 1996).  Beyond medical evidence, there are seven factors that the ALJ should consider.[4]  The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence.  *See Cross*, 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406 F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

In the present case, the ALJ provided four reasons why he found incredible Plaintiff's testimony that her mental impairments prevented her from getting out of bed 12 to 14 day a month: (1) there is no support for such significant limitations; (2) Plaintiff did not report such limitations when she was contacted by the district office; (3)  Plaintiff's son indicated that her

---

[4]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96–7p, Introduction; *see also Cross v. Comm'r of Soc. Sec*., 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

limitations were related to dizziness, back pain, and migraines, not mental limitations; (4) and the state agency psychologists concluded that plaintiff had only mild restrictions as to her activities of daily living.

The Commissioner first argues that Plaintiff waived her arguments as to credibility, because she failed to adequately develop an argument as to how the ALJ erred.  An issue is waived when it is "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  In this case, Plaintiff did not waive her arguments as to credibility.  On pages 17, 18, and 19 of her brief, Plaintiff provides the relevant legal standards and cites to record evidence to support her argument.  The argument is not waived, and, on review of the arguments and the record, the undersigned concludes that the ALJ's credibility analysis is flawed.

As discussed above, the opinions of Dr. Long and Dr. Lloyd rely heavily on pre-assault evidence and findings, and the ALJ did not address how their opinions nonetheless deserve credit.  As such, without further explanation, they cannot reasonably be used to undermine Plaintiff's credibility with respect to Plaintiff's mental limitations post-assault.  Further, the ALJ is incorrect to say that there is *no* support for her claimed limitations.  In February 2012, Plaintiff reported to her counselor Kathleen Gomes that because of her depression she "won't want to get out of bed or want to get dressed."  (Tr. 532).  And the record is replete with evidence that Plaintiff was complaining of ongoing mental impairments.[5]

---

[5]For example, there is evidence that Plaintiff "feels afraid all the time" (Tr. 524); is "always shaking inside" (Tr. 525); was depressed that she "can't read because she cannot retain things, she cannot concentrate" (Tr. 525); had a flat affect (Tr. 529); was having "nightmares about it and crying in her sleep but now she is not sleeping much at all" (Tr. 532); appeared glum with signs of anxiety and she was easily distracted (Tr. 536,

While plaintiff did not report all her limitations during the call from the district office, this is hardly evidence that would undermine her testimony that she was unable to get out of bed because of her impairments.

Further, the ALJ's reliance on a statement by Plaintiff's son is misplaced.  Under the regulations, Plaintiff's son is an "other source" as defined in 20 CFR 404.1513(d) and 416.913(d).  The ALJ may use such evidence "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  SSR 06-03p.  Here, the son's statement was used not simply as evidence of the severity of her impairments and the manner in which she was affected by them.  Rather, it was used to demonstrate which of her impairments in particular was negatively affecting her ability to engage in daily activities.  This use of the son's statement was contrary to the regulations.

In sum, the ALJ did not properly support with substantial evidence his determination that Plaintiff was not credible when she testified that her impairments prevented her from getting out of bed 12 to 14 days per month.

**D.     Step Three**

At step three, the ALJ considers whether a claimant's impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1.  If the ALJ finds that it does, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d)

---

538); was experiencing panic attacks once or more daily (Tr. 537); had "horrible" short term memory (Tr. 554); had "progressive downhill feelings of depression" (Tr. 556); was "still crying some"; and "feels paranoid and always scared," *inter alia*.  (Tr. 570).

A claimant's mental impairment meets or equals a mental disorder listing if it satisfies both the paragraph A and B criteria of a mental impairment listing.  *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(A).  Plaintiff's challenge in the present case relates to whether the ALJ properly concluded that Plaintiff's impairments did not meet the B criteria.  To meet the B criteria of Listings 12.04 and 12.06, a Plaintiff must establish two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *Id.* §§ 12.04(B), 12.06(B).

In the present case, Plaintiff challenges the ALJ's "B" criteria conclusions that she has a mild restriction in activities of daily living and that she has moderate difficulties in her ability to maintain concentration, persistence, or pace.  (Tr. 17).  These conclusions by the ALJ turned, at least in part, on the opinions of state agency consultants Drs. Lloyd and Long, the third party statement of Plaintiff's son, and statements of plaintiff made to the district office.  As addressed above, *supra* Sec. VI.A, the ALJ did not properly explain his reliance on the opinions of Drs. Lloyd and Long over the opinion Plaintiff's treating physician.  Without such analysis, these opinions cannot reasonably justify the ALJ's determination at step-three.  In addition, the undersigned has already addressed in the credibility analysis, *supra* Sec. VI.C, the flaws in the ALJ's reliance on the third-party statement of Plaintiff's son and the statements she made to the district office.  Accordingly, on remand, Plaintiff should be reevaluated at step three.

E.      **The ALJ's failure to incorporate impairments connected with Plaintiff's PTSD in the RFC**

Plaintiff maintains the ALJ erred in failing to incorporate Plaintiff's impairments arising from her PTSD in the residual functional capacity finding.  While Plaintiff asserts, and the Commissioner seems to accept, that this alleged error should be evaluated as a step-five error, the error alleged is more appropriately described as a step-four error.

At step five, the Commissioner has the burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987)).  In the present case, Plaintiff does not argue that the Commissioner failed to meet her step-five burden.  Rather, Plaintiff asserts that her assigned RFC did not reflect her post-assault impairments which consist of PTSD, major depression, and headaches.  Because this assignment of error is actually a challenge to the determination of Plaintiff's RFC, it should be evaluated as a step-four error, not a step-five error.

In any event, given that the undersigned has already recommended remand in relation to other errors at step four, Plaintiff's arguments on this point need not be addressed.

F.      **The Commissioner's Harmless Error Arguments**

The Commissioner argues that if there was an error in relation the ALJ's reliance on Drs. Long and Lloyd's opinions, that error was harmless.  (Doc. No. 15 at 10-11).  The Commissioner notes that both of their opinions were based on post-assault evidence in addition to Dr. Carraway's and the prior ALJ's pre-assault opinions.  (Doc. No. 15 at 11).  This argument is unconvincing.  As already described, ALJ Watson failed to recognize that both Dr. Lloyd and Dr. Long explicitly gave "great weight" to arguably irrelevant evidence and opinion; and he

31

failed to reasonably explain why Dr. Lloyd and Dr. Long's opinions nonetheless deserve more weight than that of Plaintiff's treating physician.  The fact that Drs. Lloyd and Long may have relied on additional evidence does not cure these deficiencies.

The Commissioner also argues that any error that might have occurred is "especially harmless" since "Dr. Carraway's notes show that Plaintiff did not endorse significant difficulties in activities of daily living."  (Doc. No. 15 at 11).  Defendant states that according to Dr. Carraway's notes "Plaintiff described a typical day as involving dressing herself, moving around her house, enjoying her hot tub, visiting with a girlfriend that lived nearby, and cooking."  (Doc. No. 15 at 11; Doc. No. 15-1 at 2).  The Commissioner maintains the error was harmless because Plaintiff "fails to explain how Dr. Carraway's opinion would compel the ALJ to find that she had marked limitations in activities of daily living."  (Doc. No. 15 at 11).

This reasoning misses the point.  Plaintiff does not argue that Dr. Carraway's opinion should have been included in the record, and nowhere in the briefing does Plaintiff even suggest that had the ALJ considered Dr. Carraway's opinion, the outcome of her case would have been different.  Rather, the error arises from the ALJ's failed to acknowledge that Drs. Long and Lloyd gave "great weight" to Dr. Carraway's opinion, and he failed to reasonably justify favoring their opinions over that of Plaintiff's treating physician.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this matter REMANDED for further proceedings consistent with this Report and Recommendation.


_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: November 2, 2016

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  _See United States v. Walters_, 638 F.2d 947 (6th Cir. 1981); _Thomas v. Arn_, 474 U.S. 140 (1985), _reh'g denied_, 474 U.S. 1111 (1986).**